And we're going to hear the first case with Judge Ebell who's appearing by Zoom because he's recovering from COVID and he didn't want to infect any of you. And then we're going to take a short break and we're going to have Judge Baldock come out for the rest of the case or the only other case we're hearing today. So thank you. The first case today is Dine Citizens Against Ruining Our Environment v. Haaland and I should probably indicate that that's 21-2116 and we are ready counsel whenever you are. Good morning your honors and may it please the court. My name is Kyle Tisdell representing Appellants, Dine Citizens Against Ruining Our Environment, San Juan Citizens Alliance, Wild Earth Guardians, and Sierra Club. I'm joined by my co-counsel Samantha Ruscavage-Bars, Allie Beasley, and Rose Rushing as well as members and declarants from appellant organizations who are sitting in the gallery today. I respectfully request to reserve five minutes of my time for rebuttal. Okay, you will have to keep track of that yourself. Yes, your honor. There's four points that I would like to make today. First, BLM's post-talk EA addendum prepared without suspending, vacating, or otherwise reconsidering decisions already made was predetermined, unlawful, and should thus not be considered by the court. Yet even if this analysis is considered, BLM failed to take a hard look at cumulative water impacts, in particular the effects that 40 billion gallons of water use would have on water sources in communities. BLM also failed to take a hard look at air pollutant emissions and resulting health effects to nearby residents. And finally, BLM failed to take a hard look at climate impacts of its drilling approvals, both through flawed emissions quantification and by failing to consider the effects of these emissions. Before I address these points, I want to acknowledge that this is not the first time appellants are appearing before this court. In an earlier case, Denae Carey v. Bernhardt, this court found that the Bureau of Land Management violated NEPA by failing to consider the cumulative impacts of all reasonably foreseeable oil and gas wells prior to its approval of the challenged applications for permit to drill or APDs. And that was as to five permits? The challenge was to a broader suite of permits? The result was as to five permits, correct? That's correct, Your Honor. And the others were incomplete records, so the court didn't rule on them? That's correct, Your Honor. So following this decision, appellants encouraged the agency to apply this court's judgment to other similarly approved oil and gas wells in the planning area. However, appellants were ultimately compelled to challenge these wells through this action, and only after this case was filed did the agency attempt to cure its deficient NEPA analysis for the 370 individual wells challenged here through a post hoc EA addendum. So turning to the four points I'd like to make today. First, BLM's predetermination of its APD approvals through a post hoc EA addendum. The preeminent goal of NEPA is defeated when the agency's analysis cannot shape or modify the decisions made. First, I want to make sure I understand one thing. If we were to conclude that there was not a hard look, we wouldn't need to decide the predetermination issue, would we? No, Your Honor. The challenge here is to all 81 underlying environmental assessments that approved the wells, and then the EA addendum was a And some of them, they're not ripe yet, right? There hasn't been an approval. Well, the NEPA has been completed for all of the challenged wells here today. There might be some EAs that need the final sort of ministerial step of approving the actual drilling itself, but the government has acknowledged that at least approximately 200 of those wells are properly before this court, even sort of setting aside the issue of ripeness. So here, in preparing the EA addendum as an attempt to cure the deficiencies of the original analysis, BLM expressly chose not to reopen the decision records for the challenged drilling permits. According to this court, unlawful predetermination occurs when an agency's NEPA is committed to producing a certain outcome, and that is precisely what happened here. Well, isn't it that it has to be irreversibly and irretrievably committed? That's correct, Your Honor. Okay, and so here, EPA can withdraw these permits anytime it wants, right? Or the BLM, I'm sorry. The BLM cannot. This court has found that the point of irreversible and the leasing stage, and that is the point where this court has recognized that that point of commitment occurs. Here, we are at a subsequent stage to even the leasing stage, which is the APD stage. So once that NEPA analysis is prepared, those decisions are final. That doesn't mean that the agency cannot sort of modify those permit approvals in light of whatever analysis is prepared, but those decisions are the point of irretrievable commitment has already been made by the agency. So would they just have the authority to say, we're suspending all of our approved permits, even though we've contractually agreed to it, even though the companies have committed to it, even though the companies have started drilling in many cases? Could they say, we just didn't allow it, we're going to put a halt to everything? And where would their responsibility be for that? Yes, the agency does have authority to suspend those permits, and our position is that's what should have happened here, to allow... They can suspend them even for drilling that already started? Yes, the agency can suspend permits at any point, and in particular here where they're preparing supplemental NEPA analysis, that suspension should have occurred to allow the agency to evaluate whether those permits should be approved or modified in the first place. Mr. Tisdale, is this an unusual circumstance where there are supplemental assessments after the issuance of APD? It is, Your Honor. You've never seen it before? It happens from time to time. I think the circumstances here are unique in that, again, the underlying environmental assessments approving the APDs that were challenged here are substantially similar to those that this court reviewed in Dene Care v. Bernhardt. After that decision was issued by this court, I think the agency saw that its other similarly approved applications for permit to drill were similarly vulnerable, and so it attempted to cure those deficiencies through this post hoc EA. How does that differentiate this case from the cases where they went ahead and did supplemental assessments after the APD? You said there are other cases? Yes. The first time we were before this court was in Dene Care v. Bernhardt. I'm not talking about this case. I'm talking about other cases where they have done the same thing. I want you to tell me why this case is different than those cases. In this instance, the agency did not suspend or vacate or set aside its approvals pending the supplemental analysis that it prepared. All right. So in the other cases you said, you maybe misunderstood my question. My question was, are there other cases where they issued supplemental assessments where there was an APD, and I guess I should add, it was not suspended? I'm not specifically aware of cases that mirror the circumstances of this case here, Your Honor. Okay. Now, I just know that you only have six and a half minutes left, and you want to reserve time. I would like to jump to the climate issue, if my colleagues would permit that. To me, one of your apparent omissions here was to establish the target by which the pollution could be evaluated. As you say, there was a certain amount of greenhouse gases that would come from this. But I didn't see where you said, and here is the target of what is acceptable or what would be harmful. How can an agency do anything with just a figure of 0.48 percent increase in omissions or 0.23 percent emissions increase, unless they have some target? So if there is a target, would you tell me where it is right when in the record and what those targets are? Yes, Your Honor, and I think you sort of identify in your confusion the underlying deficiencies with the agency's analysis here. So it attempts to do exactly what you're saying, is to estimate regional, statewide, and national emissions at sort of this fractional scale. We're just talking about greenhouse gas emissions right now, is that right? Yes, my question is just greenhouse gases. Thank you. Correct. And so any single source of emissions is going to look insignificant when compared to those type of comparative analysis. Right, and the United States is going to recognize there's a problem with that, and a variety of sources are grappling with it. How do you cope with this? I mean, it's always going to be a significant figure, but I didn't see that you proposed a target by which a decision-maker agency could make some reasonable or rational decision about is this a problem or isn't it a problem? So there is in the record, Your Honor, one methodology that we have proposed to the agency, and that is by applying those emissions to a global carbon budget. Other courts have recognized the use of the global carbon budget, and the agency itself has identified a global carbon budget as a, quote, convenient tool to simplify communication of a complex issue. So that methodology was suggested to the agency as one way that it could meet its duty to evaluate the effects, environmental significance. Who disavows this carbon budget? Is that an agency determination, or is that just some ad hoc industry determination? Global carbon budgets have been recognized by the Intergovernmental Panel on Climate Change, so it's a tool that the IPCC uses, and it's also a tool that has been used by the Bureau of Land Management in other circumstances. So when you use the global budget, you get a very tiny figure. Now, how is a decision-maker supposed to make any kind of a reasonable decision of whether this is serious or not when you have such a tiny little fraction? I just don't think you have given the agency—you're not supposed to make decisions you should or shouldn't be doing. You should provide environmental information to the agency by which they can act. I don't see how the agency can act, and I see that you're coming here, so you're agreeing with me, but I don't see how—I'm just troubled by that. So the agency is supposed to use the global carbon budget by comparing direct, indirect, and cumulative emissions to that, and a cumulative emissions analysis requires this project to be emissions at a regional and a national scale. You said that it will increase at 2.23% and 0.48% variously for various gases, but it's uncertain what time frame you've chosen, whether you used a 20-year or a shorter period, and no evaluation that I can see about what you—again, I know it's not you, but I mean, I'm really setting up a target for your—for the appellee, but I'd like—if you think that's a serious problem. Again, I do believe that the global carbon budget is this threshold by which additional emissions are essentially a debit onto the account of that remaining threshold to remain under these scientifically prescribed warming thresholds. There are other tools and methodologies, such as the social cost of carbon, for example, that the agency could also use, but the critical point you're— talk about that for just 30 seconds, because that might be a target that occurred to me that would be more manageable and useful, but just talk about that for a second. Can—if I could also—I'd like to—I don't see that you raised that. It looks to me like an amicus curie raised that. An amicus—it was raised by the amicus, yes. Correct, Your Honor. It's true. So, the social cost of— Judge McHugh makes a good point, because it was the amicus that did raise that. So, it may not even be before us, but I'm not sure that amicuses can raise new issues for the parties. So, why don't you just—if you argue, we'll deal with it and react to it. And this—we've had a lot of questions. We'll give you a little time on rebuttal. Okay, thank you. I would just say that, again, I think the agency's failure to consider cumulative water use and discuss the effects of those uses, as well as air pollutant emissions and the health effects to nearby residents, those were also significant deficiencies in the agency's analysis. I will reserve whatever time this Court provides on rebuttal, and thank you. We'll give him two minutes. Okay, thank you, Your Honor. And will you add two minutes to them so it's fair? Yeah. Good morning, Your Honors. May it please the Court. My name is Bridget McNeil, and I'm here today representing the Bureau of Land Management, BLM, and I am sharing two minutes of the government's time with counsel for API. As counsel for API plans to address remedy, I do not plan to address that issue unless you have questions for me on it. But I would like to address the supplementation predetermination issue and the climate change issue. It seems like there are a lot of questions about that. But as you know, or as Mr. Tisdell noted, this is Petitioner's second appeal on the merits, trying to invalidate hundreds of APDs. The first appeal, as your questions clarified, resulted in invalidating only five EAs, and BLM addressed the particular issues raised by the air quality and climate change, not just for those five EAs, but for 81 other decisions covering 370 well applications. Now, this was not enough for petitioners, and maybe nothing ever will be, but that's not the standard for evaluating the agency's NEPA compliance. The standard is whether BLM took a hard look at the environmental significance of the action's impacts, deferring to the agency's factual and scientific conclusions on areas implicated by their expertise here, such as BLM's expertise in managing oil and gas development and making predictions of those impacts. Now, applying those standards, this court should reject petitioners' claims and uphold BLM's analysis. Now, on the predetermination, did you have a question? Yes. I mean, the drilling's already going on. It's been approved. You know, isn't it too late not to have been predetermined? Isn't the, at this point, the agency's committed? Well, I think there's two answers to your question. You know, one is that the scope of this case is petitioners' own making. They haven't challenged one particular decision. They've tried to get a wholesale challenge to numerous decisions, and so the various states of action and activities, you know, these go back to 2014, and a lot of them could have been challenged much earlier, but weren't. And as we noted, only about 200 or so of these have been approved. There's many that have yet to be approved, so there's certainly no operations happening on those applications. And then there are also some, a small handful of numbers where operations have finished and the wells are expired or abandoned. But to your question, was Mr. Tisdell correct that you concede that there is no ripeness problem with the ones where there hasn't been a stage three permit yet? Oh no, we certainly do not concede that. You know, I think that the arguments and petitioners' reply brief on ripeness and remedies sort of conflate the issues. You know, they argue that the court just should exercise equitable authority and still invalidate all 370, but the case law is quite clear that you do need a final agency action in order to have jurisdiction. And without jurisdiction, of course, there is no remedy over those particular NEPA analyses standing alone without a decision. But I think part of your other question before that, Judge McHugh, was what would be the value of the supplemental analysis? And here, BLM was very clear to the public in the EA addendum that it was, you know, looking at all of this additional information, especially the cumulative impacts of all of these together, and it would evaluate anew whether it could make a finding of no significant impact. And if it could not, it would take further action. It would reconsider the decisions at issue. And what the result of that would be obviously would be speculation, because that's not what happened here. BLM was able to make a new finding of no significant impact, but if they had not and they needed to perform additional NEPA analysis and potentially modify or issue a new decision, then certainly the supplemental process had value and BLM retained discretion to reopen these decisions. The fact that it did not need to certainly does not prove predetermination. So the irreversible and irretrievable commitment you were discussing with counsel for appellants, I'd like to note that some of the the leasing case law that they pointed out to you is looking at this irreversible and irretrievable in the NEPA context, not in the predetermination case law. As we discussed in our briefs, there's really not a good fit between the predetermination case law and what happened here with supplementation. Predetermined case law almost always looks at, you know, before there's been a decision even made, has the agency, you know, committed, entered into a contract, something like that. It doesn't fit nicely with the situation where the agency determines that it needs to do supplemental analysis. But yet NEPA and its implementing regulations certainly do envision times where the agency does need to perform supplemental analysis. And importantly, those regulations do not require the agency to suspend or vacate the underlying decision. Those supplemental analyses are, you know, performed within the presumption of agency regularity that's afforded to agencies that they'll do the right thing depending on the results. Finally, on the predetermination. Did the agency approve any, lease any more of those operating permits after the request for a suspension? After the remand? Well, you will see in the record, your honor, there is a change of numbers from when this was briefed at the district court. And then we did provide an updated declaration. And that's where those numbers of 199 that have now been approved. And I did check on those numbers yesterday. It's roughly the same. There's possibly about five additional EAs that have had an approved decision now. Does that answer your question? I mean, you say it was really similar to the other predetermined issue cases. But as to permits for drilling that have been granted after the remand, wouldn't that kind of fit within those, that context? I see your question. I think the EA is here are from 2014 to 2019. So I don't know that this case implicates any APDs that have been granted after this court's prior decision, if that's your question. Okay. I'd like to turn to the climate change piece. And I certainly don't want to reiterate the affirmative analysis that was done. I do urge you to consider those arguments in our brief. And you will see that BLM engaged in a very detailed and thorough assessment of these issues. They explained how they were using the science and the methods available at the time. But what they did on the climate change, or I guess we're talking about greenhouse gases then, is that they looked at all of the greenhouse gas emissions throughout the country and all of those in the state and said this is really a small part of either one of those. Is that essentially the analysis? They also looked at, they looked at regional and then state and then national impacts. And there are several good tables in the EA addendum that have those particular figures that I would point to. That analysis always can give you a very tiny percentage, isn't it? And I, I mean, so maybe it is in this case, I thought about it because you were challenging the hard impact of the greenhouse gas emissions. So maybe it is included in the interplay. But just to say, yeah, it's a tiny little percentage. All over the world, these are going to be tiny little percentages for the most part. Well, Your Honor, I think that speaks to the statute and the analysis that's required here. I mean, NEPA is a public disclosure and environmental impact assessment tool. You know, NEPA itself doesn't set any particular policy direction. You know, that's true. But if I were a, if I were an organization, the government that had to make a decision, I would say, well, what does this mean? It goes up by 0.25% or 0.48% for a few years. What is the significance of that? And I think you're supposed to help evaluate what the significance is. And I would be totally at sea with just those raw figures. Yes, Your Honor. I would point you to some other, you know, cumulative figures on JA1880, where it does put, you know, these, these emissions in context with the actual metric tons. But I recognize that's just maybe a horse of a different color of, you know, a large seemingly amount. But let me, I have another issue on the calculation of the direct greenhouse gas emissions. It appears that the BLM took one year of the volume of gas emissions and used that one year figure, even though the estimate was 25 years for the operation of these wells. Am I correct about that? Yes, what BLM did was they quantified the direct emissions with the one-time construction of a well, which they do now. And then they did explain in the EA addendum that they were estimating annual emissions for operations. But the, but the, but the operations were estimated to go 25 years. Yet the, when you look at the quantity, the actual, I don't know if it was tons for a cubic meter or whatever the figure was, it's exactly the same. Over one year's emissions are what's calculated for the 25-year life of these wells. It's not one year times 25 is my point. Am I correct about that? Well, 20 years is the reasonably foreseeable development scenario, but yes. So it's not one, it's not that figure times 20 that you're using. It's just the figure of one year that you're using to represent the emissions for 20 years. No, the EA addendum discloses the operational as annual estimates, and it does explain perhaps more clearly in the response to comments that this is done both because there's not, you know, the 2019 greenhouse gas emissions white paper explains in more detail why it is not possible to calculate the lifetime of a particular well and get this number, you know, references, particular examples of geology and things like this. But also key, I think, is that annual emissions are the metric that is used both for the United States official estimates, and it's what EPA uses. It's basically how folks are able to compare particular emissions associated with a project versus other emissions. So, you know, I think the district... Well, you know those annual figures are going to go down over time, and it depends on how many you did. I think you didn't take that one year and multiply it by the years of the estimated life of the well. So unless that's wrong, I think that is, I mean, I don't know if decision makers kind of use that information usefully. Well, as the district court, I think, noted, you know, the goal is public disclosure, and as we can all tell, this is an annual emission, and you can, you know, kind of do some back-of-the-napkin math, but comparing the annual emissions is a way for decision makers to evaluate the impacts of a particular project. I'd like to actually address another point. But Table 14, and maybe I'm reading it wrong, looks like it purports to estimate the combined downstream end-use GHG emission from the 370 subject wells over the predicted 20-year life of the wells, and then it picks up the number for one year and sticks it in that column. That, I mean, I'm not a math genius, but that seems problematic to me. Your Honor, I'm sorry, I didn't understand your earlier question to be talking about the downstream end-use, which is a different figure and was calculated for the 20-year reasonably foreseeable development scenario. In other words, once they take the oil and gas out of these wells and, you know, it burns in power plants or, you know, out in the world, basically, that is a 20-year figure. Now, did they, they chose 20 years for the lifetime of the well for that estimate to give that downstream, so that is estimated for 20 years, which is separate than the direct emissions associated with the operation of the well. And I'm going to alert you that that is the total for your side of the argument that you're looking at right there, and I thought you were trying to split. I said I was going to give them two minutes. Oh, okay. So, thank you. If you have other questions in the last 20 seconds on water or air quality, I would just add that, you know, certainly many courts have looked at this climate change issue and found that contextualizing emissions at the regional, state, and federal level complies with NEPA. Several district courts within this circuit, including, and I will hand over my time. May it please the court, Stephen Rosenbaum for the American Petroleum Institute. I'm going to address the question as to what remedy would be appropriate if the court were to find there were any NEPA violations, although we are entirely in agreement with the federal government that there were no violations. The law is clear that it is well within the court's discretion in such a circumstance to remand for further decision making without vacating the approvals or imposing any other limitations, and that is certainly the result we would urge. The prevailing case law suggests that if there is at least a serious possibility that the agency can sustain its original decision on remand, then vacatur is not the appropriate approach to take, and we think that applies here. Obviously, we're well aware that in the earlier case, the court did vacate five EAs, but we believe that that was quite distinguishable, and let me explain why quickly. First of all, the shortcoming was of a very different character back then. In the earlier decision, the court said, and I will quote, BLM did not consider the cumulative water use associated with the wells, period. There was a failure of analysis, period. Here, it's only a fight over methodology, and that is inherently curable. Second, the impact here would be much larger. The earlier decision only affected five EAs, only 12 wells. Here, we're talking about 390 wells potentially, and so the adverse economic impact, for example, if you look at the enduring declaration, the $2.8 million a month that goes to Navajo-Olatiz from their producing wells, that gets wiped out. Finally, there's a timing problem. In the earlier case, the EAs that were vacated, the five EAs vacated, had been approved within four months of the lawsuit being filed. Here, in 2019, they filed a challenge to EAs from as early as 2014. They did not act expeditiously. The world moved forward because of them, and for that reason, we would ask that there be no vacature or other limitations imposed if the court were contrary to the arguments which suggest your ballot were defined there to be a NEPA violation. Thank you. And Mr. Tisdall, you have two minutes. Thank you, Your Honor. Let me begin by just correcting something I stated earlier. With respect to the tools and methodologies available to the agency, while our briefing did focus on the use of a global carbon budget, our comments did raise the use of the social cost of carbon that can be found at JA972. So there are just a variety of methodologies available. You didn't brief that. It was an amicus who briefed it. Correct, but it is in the record. But let me speak quickly just to the common thread, I think, with respect to the agency's hard look here, is the agency provides quantification of greenhouse gas emissions, water use, and air pollutant emissions, but it never sort of makes that next step to discuss the effects of those emissions. And this court's questions with respect to that concern over the comparative analysis, using that comparative analysis to draw conclusions on significance is exactly what the Ninth Circuit addressed earlier this year, finding that, quote, the reader is left to guess how or why greenhouse gas emissions from the project represent an insignificant contribution to the environmental consequence identified in the EA. This is like saying, comparing Bill Gates' wealth to all the money in the world and saying that he's poor or his wealth is insignificant. You just can't make that type of correlation from the comparative analysis that is provided. And the final agency action challenged here is the NEPA analysis. It is not the final ministerial act of approving wells. And so the application with respect to this question of ripeness would essentially have appellants appear and file cases every single time an additional well gets approved. And the Supreme Appellate is appropriate in this case. So thank you for your time. Thank you, counsel. This matter has been submitted. We'll turn to the next matter. You're excused. Thank you for the extensive briefing and argument. Thank you. And we're going to take a short break to reconfigure the panel.